**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATIONWIDE PROP & CASUALTY      *
INSURANCE CO.,

                               *

         **Plaintiff,**

                               *        **Case No. 1:20-cv-00684-JRR**

    v.

                               *

THE FIRELINE CORPORATION,

                               *

         **Defendant/Third Party Plaintiff,**

                               *

    v.

                               *

CHESAPEAKE SPRINKLER
COMPANY,

                               *

         **Third Party Defendant.**      *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

      This matter comes before the court on Defendant The Fireline Corporation's ("Fireline") Motion for Summary Judgment as to Plaintiff Nationwide Property & Casualty Insurance Company's ("Nationwide") Complaint. (ECF No. 61; "the Motion.") The court has reviewed all papers. No hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons set forth herein, the Motion will be granted.

## BACKGROUND[1]

### I.    <u>The Agreement</u>

      Plaintiff Nationwide is a property insurance business with its principal place of business in Columbus, Ohio. (ECF No. 1 ¶ 1.) Defendant Fireline is a fire sprinkler business with its principal place of business in Baltimore, Maryland. *Id.* ¶ 2. During the period relevant to this action, Maple

---

[1] Unless otherwise stated, the Background section sets forth undisputed facts.

Lawn Homeowners Association, Inc. ("Maple Lawn") owned and operated the common property at 7600 Maple Lawn Blvd., Fulton, Maryland, which included a community center (the "Subject Property"). *Id.* ¶ 3. Maple Lawn maintained property insurance through Nationwide. *Id.* ¶ 4. Third Party Defendant Chesapeake Sprinkler Company ("Chesapeake") is a corporation with its principal place of business in Odenton, Maryland.[2] (ECF No. 38 ¶ 3.)

Prior to 2018, Fireline provided services to Maple Lawn, including inspecting, managing, and maintaining the sprinkler system. (ECF No. 62-3 at 8.) In January 2018, Seni McDonnell, the Maple Lawn Property Manager, sought to continue services with Fireline. (ECF No. 61-3 at 10.) On January 18, 2018, Fireline entered into an Inspection Agreement (the "Agreement") with Maple Lawn whereby Fireline agreed to provide annual fire alarm inspection and testing services, quarterly sprinkler inspection and testing, and annual portable fire extinguisher testing and inspection at the Subject Property. (ECF No. 61-2 at 3, 5-6.) The Agreement consists of eight pages, including Fireline's Standard Terms and Conditions. *Id.* at 3, 5-9, 11-12.

The Agreement contains six provisions relevant to this case. First, the Scope of Inspection provision provides in pertinent part:

> **1. Scope of Inspection**: The inspection and testing services provided by this Agreement are designed to determine the functionality of the inspected systems at the time of the inspection/test. The inspection and testing provided under this Agreement <u>does</u> <u>not</u> <u>include</u>: maintenance, repairs, alterations, or replacement of parts or any other field adjustments. COMPANY may choose to offer such services *at an additional charge*, but is not obligated under this Agreement to do so. The inspections and testing provided under this Agreement are NOT a system survey or engineering analysis of the system, its installation and/or its design. Inspection and testing under this Agreement are not intended to reveal design or installation flaws or code compliance violations. To the extent any dry pipe or pre-action systems are included in the

---

[2] Defendant and Third-Party Plaintiff Fireline filed an Amended Third Party Complaint seeking contribution from Third-Party Defendant Chesapeake alleging that Chesapeake's negligence caused, in whole or in part, the damages claimed by Nationwide. (ECF No. 38 ¶¶ 6, 9.)

> Agreement, the inspections provided herein do not include any analysis or inspection as to whether the piping is properly or adequately sloped and/or pitched . . . . The scope of work under this Agreement is limited to the provision of inspection and testing services.

(ECF No. 61-2 at 11.)

Second, the Definitions provision provides in relevant part:

> **2. Definitions**:
> a. "Inspection" is a visual examination of a system or portion thereof to verify that it appears to be in operating condition and is free of physical damage.
> b. "Testing" is a procedure used to determine the operation status of a component or system by physically manipulating components of the system.

*Id.*

Third, the "Waiver of Subrogation" provision provides:

> 11. **Waiver of Subrogation**: COMPANY is not an insurer against loss or damage. Sufficient insurance shall be obtained by and is the sole responsibility of CUSTOMER. CUSTOMER agrees to rely exclusively on CUSTOMER's insurer to recover for injuries or damage in the event of any loss or injury to the premises or property therein. CUSTOMER does hereby, for itself and all others claiming by or through it under this Agreement, release and discharge COMPANY from and against all damages covered by CUSTOMER's insurance, it being expressly agreed and understood that no insurance company, insurer or other entity/individual will have any rights of subrogation against COMPANY.

*Id.*

Fourth, the "Dry Pipe System" provision indicates:

> **12. Dry Pipe System**: CUSTOMER is aware that dry pipe sprinkler systems must be drained after each operation of the dry valve to remove water from the system. CUSTOMER is also aware that other sources of water can exist in dry pipe systems in the absence of the operation of the dry valve; e.g. condensation from the air compressor maintaining the air pressure in the dry system. CUSTOMER is aware that residual water left in a dry pipe system may freeze, cause damage to the pipes or other components and

cause significant water damage to the premises and property therein.
During inspection and testing of dry pipe systems, CUSTOMER
must provide COMPANY full access to all low point auxiliary
drains and/or drum drips so that residual water from testing can be
drained.  CUSTOMER must also perform regular, proper draining
of low point auxiliary drains and/or drum drips in accordance with
the intervals described by NFPA 25 and as otherwise required.

*Id.*

Fifth, the Agreement contains an "Indemnify and Hold Harmless Provision,"[3] (referred to

as "Exculpatory Clause")  which provides, in part:

> 27. **INDEMNIFY AND HOLD HARMLESS**: The Customer
> assumes the entire responsibility and liability for any and all damage
> or injury of any kind (including death) to all persons, whether
> employees of Customer or otherwise, and for any and all property
> damage, or loss of use thereof, caused by, resulting from, arising out
> of, or occurring in connection with the execution of any work
> provided by Company in association with or involving the
> installation, use, operation, repair, and maintenance and
> performance of the fire detection and/or suppression equipment
> referenced herein which is caused by or detection and/or
> suppression equipment referenced herein which is caused by or
> contributed to by any negligent act, error or omission, solely or
> jointly on the part of the Company or the Customer, their agents,
> servants, or employees, including any alleged breach of any
> statutory or codified obligation and including, but not limited to any
> sole negligence on the part of Company, and/or its agents, servants
> or employees . . . .

*Id.* at 12.

Lastly, the "Time Limitation" provision states:

> 28. **Time Limitation**: All claims, actions or proceedings, legal or
> equitable against COMPANY must be commenced in court within
> one year after the cause of action has accrued or the act[,] omission
> or event occurred from which the claim, action or proceeding arises,
> whichever is earlier, without judicial extension of time or said claim
> action or proceeding is barred time being of the essence of this

---

[3] The parties refer to this provision as an "exculpatory clause," as will the court.  (ECF Nos. 61-1 at 13, 62-1 at 13.)
*See United Nat'l Ins. Co. v. Peninsula Roofing Co., Inc.*, No. GLR-16-3548, 2018 WL 1583554, at *6 (D. Md. Mar.
30, 2018) (explaining that "an exculpatory clause 'relieves a party from liability for harm caused by his or her own
negligence'").

paragraph. CUSTOMER further understands that the COMPANY is relying upon this limitation in determining the cost of services provided to you.

*Id.*

## II.   **Fireline's Service Inspections**

In April, July, and October 2018, Fireline generated reports regarding the inspection and testing services performed at the Subject Property.  (ECF No. 62-5.)  Each report, titled "Sprinkler System Report of Inspection," is set forth on a six-page form with entries for detailed information and data regarding Fireline's services and findings, as well as a section for "Field Report" recommendations.  *Id.*

The first page of the report form includes entries for Fireline to indicate "Inspection Complete No Follow up Required" or "Inspection Complete Repair Quote to Follow."  *Id.* at 7. The reports further include a section labeled "Dry Systems."  (ECF No. 62-5 at 4.)  Within the Dry Systems section, there are seven questions:

> 1. Is the dry valve in service?
>
> 2. Are the air pressure and priming water level in accordance with the manufacturer's instructions?
>
> 3. Has the operation of the air or nitrogen supply been tested? Is it in service?
>
> 4. Were the low points drained during this inspection?[4]
>
> 5. Did quick-opening devices operate satisfactorily?
>
> 6. Did the dry valve trip properly during the trip pressure test?
>
> 7. Did the heating equipment in the dry pipe valve room operate at the time of inspection?

---

[4] Question 4 includes a subsection with multiple entries where Fireline specifies the "Type" and "Location" of each of the "low points drained during this inspection."  (ECF No. 62-5 at 4.)

*Id.*  In each of the reports issued in April, July, and October 2018, Fireline notes that seven low point drains were drained during the inspection, including one located in the "Gym."  (ECF No. 62-5 at 4, 9, and 14.)  In fact, the Subject Property contains eight low point drains, not seven.  The Gym includes two low point drains, not one; but each report identifies only one.  Fireline testified at deposition that, based on the October 2018 report, it had no "reason to believe that Fireline's technician drained all low point drains in October 2018."  (ECF No. 62-2 at 23.)

On January 24, 2019, water accumulated in a section of the sprinkler system which led to a pipe freezing, splitting, and then releasing water into the community center, causing Subject Property damage.  (ECF Nos. 1 ¶¶ 9-10, 62-1 at 14.)  At all times relevant, Maple Lawn maintained property insurance through Nationwide.  (ECF No. 1 ¶ 4.)  Nationwide, as Maple Lawn's insurer, made payments to Maple Lawn for the property damage in the amount of $294,288.35.  (ECF No. 1 ¶ 11.)

### III.   Instant Lawsuit

On March 14, 2020, Nationwide, as Maple Lawn's subrogee, sued Fireline to recover its policy payout to Maple Lawn.  (ECF No. 1.)  The Complaint sets forth two causes of action: (1) Negligence;  and  (2) Breach of Express and/or Implied Warranties.   (ECF No. 1 at 3-5.) Nationwide seeks to recover $294,288.35, together with interest, costs, attorney's fees, and any other damages the court deems proper.  *Id.* at 5-6.

Nationwide maintains that Fireline is liable because Fireline's services that Plaintiff contends resulted in the damage were part of the regular maintenance services that Fireline had customarily provided well before the parties entered into the Agreement.  (ECF No. 62-1 at 7-10.) Therefore, Nationwide argues, its entitlement to recover is not cabined by the limited scope of the Agreement.  Fireline argues that the damage to the Subject Property arose from the testing and

inspection services squarely within the scope of the Agreement.  (ECF Nos. 61-1 at 10-11, 66 at 2-3.)  On September 23, 2022, Fireline filed a Motion for Summary Judgment.  (ECF No. 61.)  On October 7, 2022, Nationwide filed a Response in Opposition and Chesapeake Sprinkler Company filed a line adopting Nationwide's Response.  (ECF Nos. 63, 64.)  On October 25, 2022, Fireline filed a Reply. (ECF No. 66.)

**LEGAL STANDARD**

**<u>Federal Rule of Civil Procedure 56</u>**

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.   When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.   *Id*. at 249.    Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  This court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

In undertaking this inquiry, this court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

## ANALYSIS

### I.    <u>Choice of Law</u>

As an initial matter, it is "a long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). The interpretation of a contract is a matter of state law. *James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004). In interpreting a contract, Maryland courts apply the law of the state in which the contract was formed unless the parties agree to be bound by the law of another state. *Cunningham v. Feinberg*, 441 Md. 310, 326 (2015).

In the present case, the parties agreed that the "Agreement is made and entered into in the State of Maryland and shall be in all respects governed by and construed in accordance with the laws of the United States and the State of Maryland as if entirely performed in Maryland and without regard to any conflict of law rules and without regard to any rules of construction or

interpretation relating to which party drafted this Agreement." (ECF No. 61-2 at 12.) Accordingly, Maryland substantive law applies to this action.

II.    **Scope of the Inspections**

The precise issue is whether Fireline's alleged failure to drain one of the dry sprinkler system's low point drains falls within the scope of the Agreement. Fireline maintains the 2018 services it provided are covered by and subject to the Agreement. (ECF No. 61-1 at 10.) In response, Nationwide argues precisely the opposite — that Fireline's actions fall outside the scope of the Agreement; and therefore, Nationwide's claims are not encumbered by it. (ECF No. 62-1 at 4.)

"The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Clancy v. King*, 405 Md. 541, 556-57 (2008). "Maryland follows the objective law of contract interpretation, which 'giv[es] effect to the clear terms of agreements, regardless of the intent of the parties at the time of contract formation.'" *Impac Mortg. Holdings, Inc. v. Timm*, 245 Md. App. 84, 109 (2020) (quoting *Precision Small Engines, Inc. v. College Park*, 457 Md. 573, 585 (2018)) (citations omitted). "A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167 (1964).

The Supreme Court of Maryland explains the objective interpretation of contracts as follows:

> A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain

9

and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean. As a result, when the contractual language is clear and unambiguous, and in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract.

*Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985) (internal citations omitted).

A contract is ambiguous "if, when read by a reasonably prudent person, [the language] is susceptible of more than one meaning." *Calomiris v. Woods*, 353 Md. 425, 436 (1999). In determining whether a contract is ambiguous, the court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution[.]" *Id.* (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)).

The court finds that the Agreement is clear and unambiguous. Further, as set forth above, it is undisputed that the 2018 reports of April, July, and October, and subsequent January 2019 property damage, occurred during the term of the Agreement. Fireline and Maple Lawn agreed that "[t]he inspection and testing services . . . are designed to determine the functionality of the inspected systems at the time of the inspection/test." (ECF No. 61-2 at 11.) Testing is defined as "a procedure used to determine the operation status of a component or system by physically manipulating components of the system." (ECF No. 61-2 at 11.) As set forth in the Agreement, quarterly inspection and testing includes purging low point drains; thus, Fireline's failure to drain one of the low point drains during its quarterly sprinkler inspection and testing, as shown on the quarterly Sprinkler System Reports of Inspection of April, July, and October 2018, and as testified to by Fireline's corporate designee, falls squarely within the Agreement. Nationwide's position

that Fireline's oversight was a failure of its maintenance services (as opposed to testing and inspection services) is unavailing.

Nationwide maintains that "[t]he Agreement makes no mention of performing any draining of the system by Fireline." (ECF No. 62-1 at 8.) The court disagrees. The Dry Pipe System provision, provides in relevant part:

> . . . During inspection and testing of dry pipe systems, CUSTOMER must provide COMPANY full access to all low point auxiliary drains and/or drum drips so that residual water from testing can be drained.

(ECF No. 61-2 at 11.) This provision, when read as part of the Agreement as a whole, expressly states that draining the low point drains is a necessary step in Fireline's inspection and testing services.

Accordingly, construing the plain language of the Agreement, the court finds that Fireline's alleged failure to drain one of the low point drains during testing and inspection services falls within the scope of the Agreement.

### III.    Terms and Conditions

Fireline argues that it is entitled to summary judgment because the Agreement bars Nationwide's claims. (ECF No. 61-1 at 12.) The court agrees. As discussed below, the court finds that, pursuant to the Agreement, Nationwide's claims are time-barred; and even were they not, the Waiver of Subrogation is enforceable and bars Nationwide's claims.

### A.    Time Limitation Provision

Fireline argues Nationwide's claims are barred by the Agreement's Time Limitation provision, which provides:

> **28. Time Limitation**: All claims, actions or proceedings, legal or equitable against COMPANY must be commenced in court within one year after the cause of action has accrued or the act[,] omission

> or event occurred from which the claim, action or proceeding arises, whichever is earlier, without judicial extension of time or said claim action or proceeding is barred time being of the essence of this paragraph. CUSTOMER further understands that the COMPANY is relying upon this limitation in determining the cost of services provided to you.

(ECF No. 61-2 at 2, 12)   Nationwide counters that the Time Limitation provision "is an unenforceable and unreasonable limitation on the time in which Maple Lawn and its subrogor could file suit against Fireline." (ECF No. 62-1 at 12.)

### 1.   Contractual Limitations Period

Maryland recognizes a "strong public policy in favor of freedom to contract" and the "ability of parties to agree to a shorter period of limitations." *Storto Enterprises, Inc. v. Exxonmobil Oil Corp.*, No. WDQ-10-1630, 2011 WL 231877, at *5 (D. Md. Jan. 24, 2011) (quoting *Coll. of Notre Dame v. Morabito Consultants, Inc.*, 132 Md. App. 158, 178 (2000)). Additionally, the Fourth Circuit has long recognized that parties may contract for shorter limitations periods.   *See Atlantic Coast Line Ry. Co. v. Pope*, 119 F.2d 39, 44 (4th Cir. 1941) (explaining that "it is well settled that such a provision, if reasonable in extent, is within the power of the parties and is binding upon them, even if the stipulated period is shorter than set up in the statutes of limitation[s] otherwise applicable").

In Maryland, "parties may agree to a provision that modifies the limitations result that would otherwise pertain provided (1) there is no controlling statute to the contrary, (2) it is reasonable, and (3) it is not subject to other defenses such as fraud, duress, or misrepresentation." *Ceccone v. Carroll Home Servs., LLC*, 454 Md. 680, 694 (2017) (quoting *Coll. of Notre Dame*, 132 Md. App. at 174).  The parties do not dispute that elements one and three are satisfied.  The parties do not provide a controlling statute to the contrary, and the court is aware of none.  Further, Nationwide does not assert defenses of fraud, duress, or misrepresentation.  Accordingly, the

court's analysis will focus on the second element—whether the Time Limitations provision is reasonable.

In assessing reasonableness, the *Ceccone* court explained:

> . . . the court should consider the totality of the circumstances, including, for example, the length of the shortened limitations period [], its relation to the statutory period [], the relative bargaining power of the parties, the subject matter of the contract [], whether the shortened limitations period applies only to claims brought by one of the parties or runs in both directions, and other facets of the limitations provision—*e.g.*, it appears to apply equally to claims of negligence and intentional torts.

*Id.* at 697-98.   Further, unilateral provisions are permissible "when supported by a valid justification."   *Garcia v. Fujitec America, Inc.*, 621 F. Supp. 3d 577, 581 (D. Md. 2022).   In *Garcia*, the plaintiff argued that shortening the limitations period from three years to one year was unreasonable because it was unilateral.   *Id.* at 582.   The *Garcia* concluded that the shortened limitations period was reasonable and explained:

> Mutuality, however, does not require an exactly even exchange of identical rights and obligations between the two contracting parties before a contract will be deemed valid. Other courts have found that the fact that a contractual limitation period operates upon the claims of one party to the contract and not to the other, does not make the period unreasonable.

*Id.* (internal citations omitted).   Based on these considerations, because the plaintiff did not file his claims within one year, the *Garcia* court found that the plaintiff's claims were time-barred, and granted the defendant's motion for summary judgment.   *Id.* at 584.

Nationwide's reliance on *Kiddie Academy Domestic Franchising, LLC v. Wonder World Learning, LLC*, No. ELH-17-3420, 2019 WL 1441812 (D. Md. Mar. 31, 2019), is misplaced.   As an initial matter, *Kiddie Academy* was before the court on a motion to dismiss.   2019 WL 1441812, at *2.   In considering the shortened contractual limitations period, the court explained:

> Based on the allegations, which must be taken as true at this stage, Kiddie Academy possessed far superior bargaining power. The Amended Counterclaim alleges that the couple was inexperienced and unsophisticated in business. Further, "Kiddie Academy was the first and only franchisor that Supriya or Sumanth had ever purchased." And, they claim that they "were not familiar with the laws or with the practices of franchisors." In contrast, Kiddie is a business with multiple franchisees. Additionally, it employs a team of people to analyze and manage different aspects of its business.

*Id.* at *11 (internal citations omitted).  The *Kiddie Academy* court further found that the agreement provided no justification for a one-sided limitations clause.  *Id.* at *12.  Accordingly, the court denied the defendants' motion to dismiss because the court could not conclude prior to discovery that the one-year, one-sided limitation applied.  *Id.*

This case materially differs from *Kiddie Academy*.  Unlike *Kiddie Academy*, the record here does not indicate that Maple Lawn was "inexperienced and unsophisticated in business." Further, no party asserts that Maple Lawn did not appreciate or understand the provisions contained in the Agreement.  Indeed, Fireline previously provided services to Maple Lawn prior to the Agreement.  (ECF No. 62-4 at 8.)  In addition, in contrast to *Kiddie Academy*, the Time Limitation provision provides a justification: "CUSTOMER further understands that the COMPANY is relying upon this limitation in determining the cost of services provided to you." (ECF No. 61-2 at 12.)

Considering the totality of the circumstances, including the relative sophistication and bargaining power of the parties, their fairly long-standing business relationship, and the justification for the shortened period set forth in the Agreement, the Time Limitation provision is reasonable.  Courts routinely find that one year provisions are reasonable.  *See In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 287 (4th Cir. 2007) (explaining that "[c]ourts have frequently found contractual limitations periods of one year (or less) to be reasonable"); *Garcia*, 621 F. Supp. 3d at

583 (concluding that the one year limitations period is reasonable); *Bracey v. Lancaster Foods, LLC*, No. RDB-17-1826, 2018 WL 1570239, at *6 (D. Md. Mar. 30, 2018) (finding that shortening the period from three years to one year is reasonable); *Daniels v. NVR, Inc.*, 56 F. Supp. 3d 737, 743 (D. Md. 2014) (finding that "the one-year contractual limitations period in the purchase agreement is reasonable").

Maple Lawn solicited the proposal from Fireline for services; Fireline submitted the proposal to Maple Lawn; and Maple Lawn accepted the proposal. There is no evidence in the record to suggest that Maple Lawn sought to negotiate the terms, rejected proposed terms, or proposed new terms to Fireline. Although the Time Limitation provision applies only to Maple Lawn and its subrogor, it applies equally to all claims brought against Fireline. Further, Nationwide does not contend it did not have sufficient time to file a claim. In any event, Nationwide filed this lawsuit on March 14, 2020, almost a year and three months after the Subject Property damage of January 24, 2019, which suggests it had sufficient time to file a claim. *See Garcia*, 621 F. Supp. at 582-83 (explaining that the plaintiff had sufficient opportunity to file a claim when he argued that he filed it within the one year limitation).

### 2.   <u>Accrual Date</u>

Under Maryland law, "the general rule is that the running of limitations against a cause of action begins upon the occurrence of the alleged wrong, unless there is a legislative or judicial exception which applies." *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131 (2011). Here, the parties do not dispute that the property damage occurred on January 24, 2019. Therefore, pursuant to the Agreement, Nationwide had until January 24, 2020, to file this action. Accordingly, because Nationwide did not file until March 14, 2020, the Time Limitation provision bars Nationwide's claims against Fireline.

B.      __Waiver of Subrogation Provision__

Fireline also argues that Nationwide lacks standing to bring this action due to the Waiver of Subrogation in the Agreement.  (ECF No. 61-1 at 15.)  Nationwide contends that the Waiver of Subrogation clause is unenforceable because it seeks "to insulate Fireline from its own negligence in violation of a life safety code (NFPA 25), which cannot be permitted."  (ECF No. 62-1 at 15.) Nationwide concedes there is no Maryland authority to support this proposition.   Therefore, Nationwide directs the court's attention Massachusetts state authority, including *Fed. Ins. Co. v. CBT/Childs Bertman Tseckares*, *Inc. et al.*, No. 2004050226, 2007 WL 1630687, at *2 (Mass. Super. May 25, 2007), and *Fed. Ins. Co. v. Cogswell Sprinkler Co., Inc.*, No. 03-CV-10920-MEL, 2005 WL 4169716, at *1 (D. Mass. Feb. 15, 2005).

Nationwide's reliance on these cases is misplaced.  On this issue, the court finds *Amica Mut. Ins. Co. v. Bergmeyer Associates, Inc.,* instructive.  *Amica Mut. Ins. Co. v. Bergmeyer Associates, Inc.,* No. CIV.A. 05-4143-C, 2008 WL 526032 (Mass Super. Jan. 4, 2008).  In *Amica,* the plaintiffs argued that the waiver of subrogation clause was void because the defendant violated provisions of the Massachusetts Building Code.  *Id.* at *3.  The *Amica* plaintiffs relied on *CBT/Childs* where "the court held the waiver of subrogation did not exempt the defendants from liability for negligent violations of a statutory duty."  *Id.* (citing *CBT/Childs*, 2007 WL 1630687, at *10).

The  *Amica* court explained:

> Despite the *CBT/Childs* court's holding, [the plaintiff's] argument fails because the court there based its decision primarily on *Federal Insurance Co. v. Cogswell Sprinkler Co., Inc.*, 2005 U.S. Dist. LEXIS 45287, 2005 WL 4169716 (D. Mass. Feb. 15, 2005), which involved a full liability release, not a waiver of subrogation. In Massachusetts, it is well settled that a release from liability "cannot serve to shield the defendant from responsibility for violation of a statutory duty." Likewise, such an agreement cannot exempt a

16

wrongdoer from liability for grossly negligent conduct. However, a waiver of subrogation is unlike an ordinary release from liability because the former guarantees that the injured party will be compensated and the latter does not.

Here, [the plaintiff's] allegation that [the defendant] violated provisions of the Massachusetts Building Code is insufficient to avoid enforcement of the subrogation waiver. Evidence that [the defendant] violated provisions of the Massachusetts Building Code would simply show that it acted negligently. However, the contractual waiver of subrogation contained in the [the defendant] Contract specifically waives the parties' ability to bring negligence claims against one another. Allowing [the plaintiff] to avoid the subrogation waiver simply by alleging [the defendant] committed statutory violations would render that contractual provision meaningless. Moreover, because the injured party, [the plaintiff] Marina Point, was compensated for its loss, public policy does not demand that the court invalidate the contractual waiver of subrogation.

*Id.* at *3-4 (internal citations omitted). Accordingly, the court found that the waiver of subrogation clause was enforceable, even though the plaintiffs alleged that the defendant violated the Massachusetts Building Code. *Id.* *4. As discussed below, the court agrees with the *Amica* court, and the Waiver of Subrogation provision in this case is distinct from the clause in *Fed. Ins. Co. v. Cogswell Sprinkler Co., Inc.*, 2005 WL 4169716.

"A subrogation waiver 'is a risk-shifting provision premised upon the recognition that it is economically inefficient for parties to a contract to insure against the same risk.'" *Nat'l Sur. Corp. v. K & C Framing, Inc.*, No. 1711, 2018 WL 1830960, at *7 (Md. Ct. Spec. App. Apr. 17, 2018) (quoting *TX. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.*, 233 S.W.3d 562, 567 (Tex. App. 2007)). In *TX. C.C.*, the Texas Court of Appeals explained the public policy underlying waiver of subrogation clauses:

A subrogation waiver encourages parties to anticipate risks and to procure insurance covering those risks and also facilitates and preserves economic relations and activity. Because a property owner can generally acquire insurance to protect the property against fire

and other perils, in the context of a construction contract, the waiver of subrogation clause shifts the ultimate risk of loss resulting from such perils to the owner to the extent the damages are covered by insurance. The intent is to avoid disruption during construction and provide certainty and eliminate litigation by having the contracting parties look only to the owner's insurance for protection in the event of loss resulting from fire or other perils. In other words, a waiver of subrogation clause substitutes the protection of insurance for the uncertain and expensive protection of liability litigation.

233 S.W.3d 562, 567-68 (Tex. App. 2007).

Maryland courts have consistently relied upon the Texas Court of Appeals' public policy argument when considering waiver of subrogation clauses. *See Nat'l Sur. Corp.*, 2018 WL 1830960, at *7; *Hartford Underwriters Ins. Co. v. Phoebus*, 187 Md. App. 668, 677 (2009), *aff'd sub nom. John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313 (2010)). In *United Nat'l Ins. Co. v. Peninsula Roofing Company, Inc.*, the court explained the distinction between waivers of subrogation and exculpatory clauses:

An exculpatory clause "relieves a party from liability for harm caused by his or her own negligence." Subrogation waivers, by contrast, "shift[] the ultimate risk of loss resulting from [fire and other] perils to the owner to the extent damages are covered by insurance." As other courts addressing this very argument have observed, the rule that voids exculpatory clauses exists to ensure that "a party injured by another's gross negligence will be able to recover its losses." With subrogation waivers, however, "there is no risk that an injured party will be left uncompensated." Subrogation waivers, therefore, do not implicate the same policy considerations courts employ to void exculpatory clauses.

*United Nat'l Ins. Co. v. Peninsula Roofing Company, Inc.*, No. GLR-16-3548, 2018 WL 1583554, at *6 (D. Md. Mar. 30, 2018); *see also John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1069 (Md. 2010) (defining subrogation as "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities

that would otherwise belong to the debtor") (quoting Black's Law Dictionary 1563–64 (9th ed. 2009)).

The court is not persuaded that the Waiver of Subrogation clause is an unlawful exculpatory clause.  While the exculpatory clause may violate Maryland public policy insofar as the provision indemnifies Fireline against its sole negligence,[5] the court is not persuaded that the same public policy considerations pertain to the Waiver of Subrogation clause.  The parties agreed that Maple Lawn would obtain insurance and rely exclusively on its insurance to recover for damages like that at issue here.   Unlike exculpatory clauses, the Waiver of Subrogation "contemplates that the injured party will be able to recover for its losses."  *United Nat'l Ins. Co. v. Peninsula Roofing Co., Inc.*, 777 Fed. Appx. 639, 645 (4th Cir. 2019).  Indeed, Maple Lawn was compensated for its loss.  Determination that a waiver of subrogation clause is unenforceable on grounds that a defendant "committed statutory violations would render that contractual provision meaningless."  *Amica*, 2008 WL 526032, at *4; *see United Nat'l Ins. Co.*, 2018 WL 1583554 at *6 (concluding that "[a]dopting the position that allegations of gross negligence fall outside the scope of subrogation waivers would vitiate the important policy reasons for such waiver").

---

[5] Nationwide's argument that the Agreement's exculpatory clause is unenforceable is based on an apparent incorrect citation to the Agreement.  (ECF No. 62-1 at 13.)  Contrary to Nationwide's assertion, the provision provides that "[t]he Customer assumes the entire responsibility and liability for any and all damages or injury of any kind (including death) . . . which is caused by or contributed to by any negligent act, error or omission, solely or jointly on the part of the Company **or the Customer**, their agents, servants, or employees . . ."  (ECF No. 61-2 at 12) (emphasis added).

An exculpatory clause "can be properly construed as reflecting two agreements, one providing for indemnity if the promisee is solely negligent and one providing for indemnity if the promisee and promisor are concurrently negligent." *Bethlehem Steel Corp.*, 304 Md. at 195.  Therefore, the Maryland statute renders "void and enforceable" the agreement to indemnify Fireline against liability for damages caused by Fireline's sole negligence.  That notwithstanding, "[t]he statute does not purport to void or excise an entire contract provision." *Bethlehem Steel Corp.*, 304 Md. at 195.  Accordingly, Maryland public policy renders unenforceable the provision indemnifying Fireline against its sole negligence; however, public policy does not prohibit the provision indemnifying Fireline for a claim arising out of concurrent negligence of Fireline and Maple Lawn.  Because the court finds Plaintiff's claims are time-barred, it need not analyze the dispute regarding sole negligence.

Accordingly, Nationwide's allegations that Fireline violated code and industry requirements do not render the Waiver of Subrogation clause void for public policy or otherwise unenforceable. Because Nationwide waived its right to subrogation, it lacks standing to assert any claims against Fireline on Maple Lawn's behalf. *American Home Ins. Co. v. Monsanto Enviro-Chem Systems, Inc.*, 16 Fed. Appx. 172, 178 (4th Cir. 2001). Therefore, even if the Time Limitation provision did not bar Nationwide's claims, the Waiver of Subrogation does.

## IV.   Attorney's Fees

Fireline argues that if it is the prevailing party, it is entitled to recover reasonable attorney's fees and cost from Nationwide. (ECF No. 61-1 at 18.) Nationwide contends that section 5-401(2) of Maryland's Courts and Judicial Proceedings statute "strictly prohibits a contractor, like Fireline, entering into an inspection and/or maintenance agreement requiring another party to pay for its defense due to claims arising from the contractor's negligence." (ECF No. 62-1 at 20-21.) In the alternative, Nationwide argues that, even if § 5-401(2) does not apply, the Attorney's Fees provision is unenforceable. (ECF No. 62-1 at 21.)

### A.   MD. CODE ANN., MD. CTS. & JUD. PROC. § 5-401 (2023)

Nationwide relies on MD. CODE ANN., MD. CTS. & JUD. PROC. § 5-401(2) for the proposition that the Attorney's Fees provision is "void and unenforceable." (ECF No. 62-1 at 21.) Section 5-401 prohibits certain indemnity clauses relating to service or construction agreements:

> (2) A covenant, a promise, an agreement, or an understanding in, or in connection with or collateral to, a contract or an agreement relating to architectural, engineering, inspecting, or surveying services, or the construction, alteration, repair, or maintenance of a building, a structure, an appurtenance, or an appliance, including moving, demolition, and excavating connected with those services or that work, purporting to require the promisor or indemnitor to defend or pay the costs of defending the promisee or indemnitee against liability for damages arising out of bodily injury to any person or damage to property caused by or resulting from the sole

> negligence of the promisee or indemnitee, or the agents or
> employees of the promisee or indemnitee, is against public policy
> and is void and unenforceable.

MD. CTS. & JUD. PROC. § 5-401(2) (2023).

Nationwide does not cite, and the court is not aware of, Maryland authority interpreting section 5-401(2) to prohibit an attorney's fees provision that is distinct from an indemnity provision. In analyzing 5-401(1),[6] Maryland courts have consistently held that "to impose liability upon an indemnitor for the negligence of the indemnitee the intention of the parties must be expressed in clear and unequivocal terms." *Blockston v. U.S.*, 278 F. Supp. 576, 591 (D. Md. 1968); *see Crockett v. Crothers*, 264 Md. 222, 228 (1972) (same); *Bethlehem Steel Corp.*, 304 Md. at 194 (same). Stated differently, the statute is narrowly tailored; it "renders unenforceable a contract provision only insofar as it embodies an agreement providing for indemnity to the promisee when the promisee is solely negligent." *Bethlehem Steel v. G.C. Zarnas & Co.*, 304 Md. 183, 195 (1985). In reading section 5-401(2) with section 5-401(1), the statute renders unenforceable a fees provision within an exculpatory clause insofar as the promisee is solely negligent. *See Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306, 316 (2d Cir. 1985) (explaining that "[i]ndemnity obligations, whether imposed by contract or by law, require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims. Legal fees and expenses incurred in defending an indemnified claim are one such cost and thus fall squarely within the obligation to indemnify).

The plain language of § 5-401 provides that it applies to certain indemnity agreements, *i.e.*, exculpatory clauses. The Exculpatory Clause here provides in part that ". . . Customer agrees to

---

[6] MD. CTS. & JUD. PROC. § 5-401(1) "bars indemnification only where the indemnitee is solely negligent." *Helm v. W. Md. Ry. Co.*, 838 F.2d 729, 734 (4th Cir. 1988) (emphasis added). It "does not bar indemnification where both the indemnitee and the indemnor are negligent." *Id.*

assume the defense of the Company and/or its agents, servants or employees upon such claim and to pay all costs and expenses incurred in connection with." (ECF No. 61-2 at 12.) Therefore, § 5-401(2) renders unenforceable the Exculpatory Clause requiring the promisor to pay the costs of defending to the promisee when the promisee is solely negligent. Nothing suggests that it applies broadly to all attorney's fees provisions. *See Bethlehem Steel*, *supra.* The Attorney's Fees provision that Fireline seeks to enforce is distinct from the costs and expenses incurred in connection with the Exculpatory Clause. Accordingly, section 5-401(2) does not render the Attorney's Fees provision void or otherwise unenforceable.

### B.    Maryland Contract Interpretation

In the alternative, Nationwide argues that the Attorney's Fees provision is unenforceable because it is unconscionable. (ECF No. 62-1 at 21.) "[W]hether a contract is unconscionable is a question of law." *Doyle v. Finance America, LLC*, 173 Md. App. 370, 391 (2007). "The prevailing view is that both procedural and substantive unconscionability must be present in order for a court to invalidate a contractual term as unconscionable." *Freedman v. Comcast Corp.*, 190 Md. App. 179, 207 (2010). The court in *Freedman* explained:

> Procedural unconscionability deals with the process of making a contract and looks much like fraud or duress. It includes concerns such as the use of fine print and convoluted or unclear language, and deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms and one party's lack of meaningful choice.
>
> Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief . . . , and [it] reminds us of contracts or clauses contrary to public policy or illegal. There is some threshold of imbalance, and we will not simply excise or ignore terms merely because, in the given case, they may operate to the perceived detriment of the weaker party. Substantively unconscionable terms are unreasonably favorable to the more powerful party, impair the integrity of the bargaining process or otherwise contravene the public interest or public policy, attempt to

> alter in an impermissible manner fundamental duties otherwise imposed by the law, or are otherwise unreasonably and unexpectedly harsh.

*Id.* at 208-209 (internal citations omitted).

Nationwide does not indicate whether it contends that the Attorney's Fees provision is procedurally or substantively unconscionable. Regardless, the court discerns no basis on which to conclude that the provision is so one-sided as to be unconscionable. *See Walther v. Sovereign Bank*, 386 Md. 412, 431 (2005) (noting that courts "will not simply excise or ignore terms merely because, in the given case, they may operate to the perceived detriment of the weaker party"). Further, nothing in the record suggests or demonstrates that Maple Lawn lacked a meaningful choice to enter into the Agreement. As discussed in Section III.A., *supra*, Maple Lawn and Fireline are businesses, worked together previously, and maintained similar bargaining powers. *See Walther*, 386 Md. at 429 (explaining that "the law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms" (quoting *Merit Music Service, Inc. v. Sonneborn*, 245 Md. 213, 221-22 (1967)). Accordingly, the Attorney's Fees provision is enforceable. *See Myers v. Kayhoe*, 391 Md. 188, 207 (2006) (explaining that "[c]ontract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland").

In analyzing fee provisions, the court follows the objective interpretation of contracts— "[i]f a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *H&H Rock, LLC v. Morris & Ritchie Associates, Inc.*, No. 1222, 2022 WL 609491, at *11 (Md. Ct. Spec. App., Mar 1, 2022).

The Attorney's Fees provision is clear and unambiguous; it provides that "in the event of any litigation regarding interpretation or enforcement of this Agreement," if Fireline prevails, the Customer shall pay its reasonable attorney's fees.  (ECF No. 61-2 at 12.)  Fireline is plainly the prevailing party; Nationwide shall therefore pay its reasonable attorney's fees.

### CONCLUSION

For the reasons set forth herein, Fireline's Motion for Summary Judgment (ECF No. 61) will be granted; the court will not reach the balance of Fireline's arguments.

A separate Order follows.


_____/s/_____
Julie R. Rubin
United States District Judge

June 14, 2023